**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NOV 1 7 2005

U. S. DISTRICT COURT
E. DISTRICT OF MO.

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. |
| | ) |
| | ) |
| ROBERT D. WACHTER, | ) |
| AMERICAN HEALTHCARE MANAGEMENT, INC., | ) 4:05 C R0 0 6 6 7 SNL |
| CLAYWEST HOUSE HEALTHCARE, LLC, | ) |
| OAK FOREST NORTH, LLC, | ) |
| and | ) |
| LUTHERAN HEALTHCARE, LLC, | ) |
| | ) |
| Defendants. | ) |

## INDICTMENT

## INTRODUCTION

The Grand Jury charges that:

1.    At all relevant times, Defendant Claywest House Healthcare, LLC ("Claywest") was a Missouri limited liability company. From the date of its organization through June 30, 2001, Claywest operated a skilled nursing facility located at 2840 W. Clay, St. Charles, Missouri 63301.

2.    At all relevant times, Defendant Lutheran Healthcare, LLC, was a Missouri limited liability company, doing business as Lutheran Skilled Care ("Lutheran"). From the date of its organization through June 30, 2001, Lutheran operated a skilled nursing facility located at 1265 McLaran, St. Louis, Missouri 63147.

3.    At all relevant times, Defendant Oak Forest North, LLC ("Oak Forest") was a Missouri limited liability company. From the date of its organization through June 30, 2001,

Oak Forest operated a skilled nursing facility located at 2600 Redman Road, St. Louis, Missouri 63136.

4.     At all relevant times, Defendant American Healthcare Management, Inc. ("AHM") was a Missouri corporation that operated and managed long-term care facilities. AHM currently maintains its offices at # 11 the Pines Court, Suite A, St. Louis, Missouri 63136. At other times AHM maintained its offices at 18330 Edison Avenue, Chesterfield, Missouri 63005 and at 15455 Conway Road, Suite 310, Chesterfield, Missouri 63017.

5.     At all relevant times, R. William Breece, Jr. ("Breece") and Defendant Robert D. Wachter ("Wachter") each owned fifty percent (50%) of AHM and were directors of AHM. Defendant Wachter was employed as the Chief Executive Officer of AHM. At times prior to April 1998, he also served as the President of AHM. Co-owner Breece served as the Vice President of AHM and, at other times, served as the Secretary of AHM.

6.     From April 1998 to at least 2003, Charles B. Kaiser III ("Kaiser") was employed by AHM as the President and in-house counsel of AHM.

7.     At all relevant times, Defendant Wachter and co-owner Breece each owned fifty percent (50%) of Defendant Claywest and forty-three percent (43%) of Defendant Oak Forest North. The Robert D. Wachter Living Trust and R. William Breece, Jr. each owned fifty percent (50%) of Lutheran.

8.     At all relevant times, Defendant Wachter also owned, directly or through trusts, Scenic View Skilled Care, formerly known as Westview Nursing Center.

2

9.    At times relevant to this indictment, AHM agreed in writing to operate, manage, and supervise the employees of Defendants Claywest, Lutheran Healthcare, and Oak Forest North and the following facilities:

- AHM Skilled and Assisted Living Center of St. Louis, LLC, formerly known as Compton Terrace Care Center, located in St. Louis, Missouri

- Santa Fe Skilled Care, LLC, doing business as Lexington Care Center, located in Lexington, Missouri

- Linn Skilled Care, doing business as Green Meadows Skilled Care, located in Linn, Missouri

- Scenic View Skilled Care, formerly known as Westview Nursing Center, located in Herculaneum, Missouri

- Florissant Skilled Care, located in Florissant, Missouri

- Oak View Skilled Care, located in Jefferson City, Missouri

- Oak Forest Skilled Care, located in Ballwin, Missouri

- Heritage Park Healthcare, LLC, doing business as Heritage Park Skilled Care, located in Rolla, Missouri

### MEDICARE PROGRAM

10.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., established the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. The Medicare Program is a federally funded health insurance program administered by the Secretary of the Department of Health and Human Services ("HHS"), an agency of the

3

United States, through the Centers for Medicare & Medicaid Services ("CMS"). CMS was known prior to June 14, 2001 as the Healthcare Financing Administration ("HCFA").

11.   The Medicare Program reimburses health care providers for specified health care services furnished to certain targeted populations, including persons who are over age 65 and persons who are disabled. Persons eligible for Medicare-reimbursed services are occasionally referred to as "beneficiaries" or "Medicare beneficiaries."

12.   The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs . . ." 42 U.S.C. § 1395hh(a)(1).

13.   In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the Medicare Program, through the issuance of manual instructions, interpretative rules, statements of policy, and guidelines of general applicability. 42 U.S.C. § 1395hh(c)(1).

14.   CMS selects private insurance companies to administer the Medicare Program and to act as its agents. Pursuant to written agreements, these private insurance companies, sometimes called fiscal intermediaries, are authorized to receive and review reimbursement claims and to make payments to providers on behalf of CMS.

15.   At all relevant times, various fiscal intermediaries, including but not limited to Tri-Span and Mutual of Omaha, served as the fiscal intermediaries for the nursing homes and skilled nursing homes managed by AHM.

4

**Medicare Reimbursement**

16.    In order to be reimbursed by Medicare, a person or entity rendering a medical service to Medicare beneficiaries must enter into a "provider agreement" with Medicare and receive a "provider" number. *See* 42 U.S.C. §§ 1395n(a), 1395cc(a). These entities and individuals are referred to as "Medicare providers" or "providers."

17.    To receive reimbursement from Medicare, the provider must submit a claim for reimbursement which includes the identity of the patient, the provider number, the service provided, and the medical necessity for the service rendered. The provider must certify that the information is accurate and complete.

18.    Prior to January 1, 1999, the facilities managed by AHM were paid by Medicare on a cost reimbursement basis. This reimbursement method was phased out nationally between July of 1998 and January of 1999. After January 1, 1999, the nursing facilities managed by AHM were paid under the prospective payment system ("PPS").

19.    Under PPS, the nursing facility was required to assess and classify residents into one of forty-four (44) Resource Utilization Groups ("RUG"), based on the patients' conditions and care needs.

20.    CMS used the RUG classification in determining the per diem reimbursement for patients. "Per diem" is the set daily rate that CMS pays a nursing facility for providing care to a resident.

## MEDICAID

21.   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., established the Grants to States for Medical Assistance Programs, popularly known as the Medicaid Program. The Medicaid Program is a federal and state-funded health insurance program administered by the various states.  The State of Missouri administers its Medicaid Program through the Department of Social Services, Division of Medical Services ("Missouri Medicaid").  The Medicaid Program provides health insurance for the indigent population of the state.

22.   In order to be reimbursed by Medicaid, a person or entity rendering medical services to Medicaid beneficiaries must enter into a "provider agreement" with Missouri Medicaid.  A Medicaid provider generally must submit a claim for payment to Missouri Medicaid and must certify:  "This is to certify that the foregoing information is true, accurate, and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws."

23.   During the relevant time period, Medicaid reimbursed nursing facilities on a "per diem" basis, which rate was lower than the Medicare per diem rate.

## FEDERAL REGULATION OF NURSING HOMES

24.   Congress, in the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), enacted the Nursing Home Reform Act, 42 U.S.C. § 1396r et seq. ("the Act"), which took effect on October 1, 1990.

6

25. A nursing facility is defined in the Act as "an institution . . . which –

    (1) is primarily engaged in providing to residents –

        (A) skilled nursing care and related services for residents who require medical or nursing care,

        (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

        (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases . . ." 42 U.S.C. § 1396r(a).

## Quality of Care Standards

26. The Act provides that: "A nursing facility must operate and provide services in compliance with all applicable Federal, State and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. §§1396r(d)(4)(A).

27. The Act further states that: "A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A).

28. The Act also provides that nursing facilities "must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which - . . . describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met . . . " 42 U.S.C. § 1396r(b)(2)(A).

7

29.    Similarly, federal regulations mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care." 42 C.F.R. § 483.25. Specifically, the federal regulations provide as follows:

(i)    **Pressure sores.** Based on the comprehensive assessment of a resident, the facility must ensure that--

(1)    A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and

(2)    A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

42 C.F.R. § 483.25(c).

(ii)    **Nutrition.** Based on a resident's comprehensive assessment, the facility must ensure that a resident--

(1)    Maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless the resident's clinical condition demonstrates that this is not possible; and

(2)    Receives a therapeutic diet when there is a nutritional problem.

42 C.F.R. § 483.25(i).

(iii)    **Activities of Daily Life.** A facility must ensure that — A resident's abilities in activities of daily living do not diminish unless circumstances

8

of the individual's clinical condition demonstrate that diminution was

unavoidable. This includes the resident's ability to–

(1)  Bathe, dress, and groom;

(2)  Transfer and ambulate;

(3)  Toilet;

(4)  Eat; and

(5)  Use speech, language or other functional communication systems.

42 C.F.R. § 483.25(a)(1)

30.  A resident who is unable to carry out the activities of daily living set forth above must

receive the necessary services to maintain good nutrition, grooming, and personal and oral

hygiene. 42 C.F.R. §483.25 (a)(3).

31.  The facility must have sufficient nursing staff to provide nursing and related services

to attain or maintain the highest practicable physical, mental, and psychosocial well-being of

each resident, as determined by resident assessments and individual plans of care. 42 C.F.R.

§ 483.30.

32.  Providers may not submit claims for services that are "of a quality which fails to meet

professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(2) (providers may

not submit Medicare claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and (3) (criminal

penalties for submitting false claims when provider knows it has no continued right to receive

payment); 42 U.S.C. § 1320a-7(b)(6)(B) (provider can be excluded from participation in

Medicare for submitting claims for inadequate care).

9

**State Surveys**

33.    The Nursing Home Reform Act mandates that the states shall be responsible for certifying that nursing facilities are in compliance with federal statutes and regulations. 42 U.S.C. § 1396r(g)(1)(A).

34.    At all relevant times the Missouri Department of Health and Senior Services, Division of Regulations and Licensure, Section for Long Term Care, formerly the Missouri Division of Aging (referred to hereafter as "DOA" or "State") was responsible for performing surveys for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid. 42 C.F.R. § 483.1.

## PROVIDER AGREEMENTS WITH AHM FACILITIES

**Medicare Provider Agreements**

35.    Defendant Wachter signed the Health Insurance Benefit Agreements (Form 1561) for AHM-managed nursing facilities and therein "agree[d] to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 C.F.R."

36.    Defendant Wachter signed Medicare Healthcare Provider/Supplier Enrollment Applications (Form 855), wherein he certified to the following provisions:

> I am familiar with and agree to abide by the Medicare or other federal health care program laws, regulations and instructions that apply to my provider/supplier type. The Medicare laws, regulations, and instructions are available through the Medicare Contractor. I understand that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

37.    AHM also completed and submitted an Electronic Data Interchange ("EDI") Enrollment Form, in order to bill Medicare electronically. In the EDI Enrollment Form, AHM agreed that "it will be responsible for all Medicare claims submitted to HCFA by itself, its employees, or its agents" and that "it will submit claims that are accurate, complete, and truthful." AHM further acknowledged "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required pursuant to this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

**Medicaid Provider Agreements**

38.    The nursing facilities managed and operated by AHM also entered into Medicaid Provider Agreements.

39.    The Medicaid Provider Agreement states that as a prerequisite to enrolling in and receiving payment from the Medicaid program, the provider must maintain full compliance with all certification requirements established by the Secretary of the Department of Health and Human Services and the State survey agency. The agreement also states that the provider must maintain full compliance with the requirements of Title XIX of the Social Security Act and the regulations promulgated thereunder relating to skilled care facilities.

11

## AHM'S Management and Lease Agreements

40.    AHM entered into management agreements with the facilities that it managed and operated. Pursuant to the management agreements, AHM agreed to:

- "supervise all the operations, bookkeeping, accounting and clerical services, including the maintenance of payroll records, receipts and disbursement journals, and other usual and customary records of the operations" of each facility;

- "hire, promote, discharge and supervise all employees" of each facility and, through an Administrator for each facility, "supervise the hiring, promotion, discharge and work of all other operating and service employees" at the facility;

- "receive, consider and handle all concerns of the residents of the nursing facility"; and

- "arrange for the making or installation," at the nursing facility's expense, "all alterations, repairs, decorations, replacements, equipment or installations" at the nursing facility.

41.    Pursuant to the management agreements, each facility paid AHM compensation for the services listed above. This compensation ranged from five to seven percent of the gross revenue of the facility.

42.    At times relevant to this Indictment, Claywest and Scenic View were located in a building owned by Defendant Wachter or entities owned or controlled by Wachter. The facilities made lease payments for the use of the buildings.

12

43.   At times relevant to this Indictment, Defendant Wachter and Kaiser held monthly meetings with facility administrators and AHM staff, who were referred to as corporate office or home office staff. AHM staff prepared and maintained minutes of the meetings.

## DEFENDANTS' FAILURE TO CARE FOR ELDERLY AND VULNERABLE PATIENTS

### Claywest House Healthcare, LLC St. Charles, Missouri

44.   In or about January 1995, AHM began to manage Claywest, which was then known as Claywest Convalescent Center. The facility had been in operation for about 15 years. After AHM began to manage Claywest, the staffing was reduced.

45.   **State Survey - Insufficient Staffing**: On or about October 17, 1997, the State conducted a survey of Claywest. On or about January 7, 1998, the State did a follow-up visit or re-visit at Claywest. The State cited the facility for failing to have sufficient nursing staff to provide nursing and related services or to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident (referred to hereafter as a F tag 353, insufficient staff).

46.   **Plan of Correction:** On or about January 23, 1998, Claywest submitted a Plan of Correction ("POC") which stated that "[t]he facility will provide sufficient staff to ensure all residents receive showers according to the established schedule."

47.   On or about January 28, 1998, Defendant Wachter stated at a meeting of facility administrators:

> We have to build up a huge warchest for 1998. We are not going to be spending any more money on improvements. We are going to finish up what we have started, but we have to build a warchest because of the changes that are coming in Medicare.

13

He went on to say "this year we must all be Scrooges."

48.   In or about March, 1998, Defendant Wachter hired Charles ("Chuck") Kaiser to be the President of AHM.

49.   **State Survey – Insufficient Staffing**:  On or about April 6, 1998, the State cited Claywest for several deficiencies, including insufficient staffing (F tag 353).

50.   From January through May 1998, there were many complaints made to the State of Missouri and to the Defendants concerning poor patient care at Claywest, including but not limited to resident-on-resident assault, residents left wet and not being dressed, residents not being bathed, changed, or washed, and inadequate staff to meet residents' needs.

51.   **Plan of Correction**:  On or about May 4, 1998, Claywest submitted a Plan of Correction, wherein Claywest falsely and fraudulently stated that it had sufficient staff to meet the needs of the residents and that the pest problems were controlled.

52.   **Resident R.C.**

a.     Eleven days later, on May 15, 1998, Resident R.C. died after Claywest failed to provide needed services.

b.     Resident R.C., an 88-year-old female, was initially admitted to Claywest on January 27, 1997.  She suffered from a number of chronic medical conditions, including congestive heart failure and chronic renal insufficiency.

c.     By May 1998, Resident R.C. was receiving hospice care, which is care provided to a patient who is not expected to live more than six months.

14

d.     Resident R.C. was totally dependent on the Claywest staff for care. While at Claywest, Resident R.C. sat for hours at a time in her own urine and feces because Claywest did not have enough staff to take her to the bathroom or to change her.

e.     About two weeks before Resident R.C.'s death, as Resident R.C. lay in her bed at Claywest, nursing staff witnessed ants crawling all over Resident R.C.-- crawling on or out of her eyes, ears, mouth and vagina.

f.     At about the same time, Claywest staff told Resident R.C.'s daughters that they had thrown away a chair that was in her room because of an ant infestation. The staff did not tell them that ants were found on Resident R.C.

g.     On or about May 14, 1998, while Resident R.C. was alive, her daughters picked ants off her body. The daughters told the Claywest staff that ants were crawling on their mother.

h.     Claywest submitted claims to the hospice program for the care purportedly provided to Resident R.C. from May 1, 1998 through May 15, 1998. Medicare paid the hospice program, which in turn paid Claywest.

53.   **Resident R. M.**

a.     On or about May 24, 1998, Resident R.M. eloped from Claywest. "Elope" is the term used to indicate that mentally impaired or disturbed patients or residents left the care facility without the knowledge of the facility staff. Resident R.M. walked about .8 miles along the four-lane outer road of Interstate Highway 70. She then crossed a six- lane intersection to a grocery store. Claywest was unaware of Resident R.M.'s whereabouts until a grocery store employee called.

b.     According to the Statement of Deficiencies ("SOD") issued by the State related to Resident R.M., Claywest had a census of 141 residents and only 14 nursing staff on duty on the day that Resident R.M. eloped. Two of the nursing staff were assigned to the Freedom Wing (Alzheimer's Unit), where there were 17 residents. The other twelve nursing staff were assigned to the remaining 124 residents, some of whom were totally dependent, confused, and "Medicare unstable."

**State Survey --Insufficient Staffing**: On or about May 30 , 1998, the State cited Claywest for insufficient staffing (F tag 353). On or about June 12, 1998, following a re-visit, the State again cited Claywest for numerous deficiencies, including insufficient staffing. Specifically, the State found that "[t]he facility continues to use the number of residents in the facility on any given day to determine the number of nursing staff to be scheduled instead of basing staffing on the care needs of the residents." The facility was also cited for serious problems with ants and mice.

55.    On or about June 25, 1998, there was discussion at the meeting of the facility administrators about the Class I citation because of Resident R.M.'s elopement from Claywest. The facility administrators were instructed that they should not contact the State about such incidents until they had spoken to Kaiser or Defendant Wachter. The corporate office would then make the determination whether to call the State. At the time Missouri law required employees of long-term care facilities (including nursing homes) to report or cause a report to be made when the employee has reasonable cause to believe that a resident of a facility has been abused or neglected. RSMO § 198.070.

16

56.   On or about June 30, 1998, the State sought to revoke Claywest's license. Defendants Wachter, Claywest and AHM opposed the revocation and Claywest was permitted to operate pursuant to a stay order under specific conditions.

57.   **Plan of Correction:** On or about July 10, 1998, Claywest submitted a Plan of Correction wherein it falsely and fraudulently stated: "the facility does currently have sufficient nursing staff . . . we are currently following policy and procedure and staffing according to acuity levels." "Acuity" as used in state surveys and plans of correction refers to the care needs of the patients or residents.

58.   In anticipation of a State survey, on or about August 30, 1998, Defendant Wachter in an e-mail informed staff at Claywest that the State would likely conduct a survey on Monday through Wednesday of "this week." He further stated that the home office will "send Debbie P., Karen B., and Amy R. to the facilities to stay ahead of the State to check water and food temps, make sure there are no mice droppings, residents are dry and happy, and in general take a proactive approach to make sure the facilities are in compliance. If there are any questions, see Chuck Kaiser."

59.   On or about October 29, 1998, Defendant Wachter stated at a meeting of facility administrators: "If you want to take a high acuity resident in order to keep the beds full, that's fine. Again be creative with who you accept."

60.   Shortly after encouraging the facilities to accept high acuity residents, on or about November 20, 1998, Defendant Wachter at a meeting of the facility administrators gave his "rule of thumb" for staffing: "Payroll is the key as that is the single largest expense. The rule of thumb is the number of occupied beds times your Medicaid per diem; produce the monthly

17

amount from that, then times it by 40%." He further stated that "Payroll should never exceed 40% of your Medicaid per diem." At the time Claywest was operating under a temporary operating permit that required certain staffing ratios.

61. **Resident M.W.**

a.    Resident M.W. resided at Claywest from June 20, 1997 to October 8, 1999. Resident M.W. suffered from a broken hip and required skilled care. She also had several chronic medical problems, including arteriosclerotic heart disease and dementia with psychotic features.

b.    Between 1997 and 1999, Resident M.W. suffered numerous injuries including a hand fracture and skin tears and bruises on her legs, arms, and hands.

c.    In or about February 1999, Resident M.W. suffered from a dislocated shoulder and pressure sores on her heels.

d.    In or about June 1999, Resident M.W. suffered from similar pressure sores on her heels and buttocks, which the Claywest staff did not treat.

e.    In October 1999, Resident M.W. was repeatedly found soaked in urine and feces.

f.    Because of the lack of care provided by Claywest staff, on October 8, 1999, Resident M.W. was removed from the Claywest facility.

g.    Claywest submitted claims to Medicaid for the care purportedly provided to Resident M.W. from May 1, 1998 to January 24, 1999 and January 26 through October 8, 1999. Medicaid paid Claywest's claim.

62.   On or about March 1, 1999, Kaiser, the President of AHM, stated in an e-mail to facility administrators and Defendant Wachter that "payroll costs shall NEVER EXCEED 40% of Revenue." He then offered the formula: "Census X Medicaid daily rate X .4 = daily payroll budget."

63.   On or about March 10, 1999, Claywest regained its permanent license to operate as a skilled nursing facility.

64.   On or about March 17, 1999, B.V., the administrator at Claywest, in an e-mail, advised Kaiser of the ongoing problems with maintaining adequate staff at Claywest. Based on a wage survey, she states: "We are not market competitive."

65.   Aware of the inadequate staffing at Claywest, Kaiser nonetheless in an e-mail to B.V. dated March 19, 1999 stated: "We do not use agency staffing."

66.   On or about March 24, 1999, Claywest administrator B.V. in an e-mail to Kaiser stated:

> The situation is becoming critical. We do not have 50% of people we need to complete a schedule for evenings and nights. [O]n evenings I would like to have 18 people in house to care for residents, yesterday evening I had 11 . . . and on nights whereas I would like 12 I had 8. It does not get the job done. Our care is suffering . . .

67.   On or about March 29, 1999, at a meeting of facility administrators, Kaiser referred to the 40% "do not exceed line" for staffing. At the same meeting, Defendant Wachter stated:

> When we get the financials we will be grading each person . . . If you haven't met your budget and we have determined that you have not controlled your payroll cost, and your census is not where it need to be and there is no up-trend, then you are going to get a phone call and you will be placed on some type of probation. That's just the way it is and I'll tell you the reason. Other than the fact that we all want to make more money and Bill and I want to make more money, we have requirements that certain banks have put on us.

68.   In an e-mail dated March 30, 1999, to B.V., the administrator at Claywest, Defendant

Wachter stated:

> Just a brief note to clarify my statements yesterday at the Admin. Meeting.  First of
> all as you have most likely noticed, I am extremely frustrated and disappointed with
> the overall results of the facilities lately.  Even though we have made much progress,
> there are things I have been working on that have been and will be delayed due to our
> current census and results.  We have a 5 facility acquisition on the table, 3 assisted
> living facilities, and 1 or 2 facilities in St. Louis.  All of which require approx.
> $30,000,000 of financing.  Due to our current census we cannot get favorable
> financing.  All the lenders are scared of the trends in long term care and PPS.  We
> would like to show them that we can do better then the general market and have a
> grasp on PPS.  I was hoping to have a large increase in census by the end of march,
> but our census is lower now than when we had two facilities under consent!!!!!!

69.   On or about March 31, 1999, Claywest administrator B.V. in an e-mail again advised

Kaiser that "my staffing is bad."

70.   **Resident D.M.**

   a.   Resident D.M., 60 years old, was admitted to Claywest on March 2, 1999.  He

was alert and oriented, with diagnoses of diabetes, dehydration, diffuse debilitation, and alcohol

hepatitis.

   b.   While at Claywest, Resident D.M. was found on occasions naked and crawling

on the floor.

   c.   On or about April 9, 1999, Resident D.M. died after admission to the hospital.

71.   On or about April 13, 1999, Defendant Wachter in an e-mail declared himself the

"dictator" of the company.  He told his facility administrators to send a card, instead of the more

expensive flowers, when a resident died.  He stated that the resident's family would appreciate

the card more.

72.   On or about April 28, 1999, at a meeting of the facility administrators, Kaiser stated:

20

Unfortunately we had to keep people that in a perfect world with a lot of people coming in and applying for jobs we would simply let go. In some facilities we simply do not have the luxury of willingly releasing people that are not very good job performers, and I'm sorry about that.

73.    On or about May 11, 1999, Claywest administrator B.V. stated in an e-mail to

Defendant Wachter:

To have an adequate schedule, I would need 21 CNA's (all shifts) and 3 night nurses, and the two medical nurses that are on medical leave to be back. My staff has been working VERY HARD to give care and keep families content. We are presently pushed to the limit. I do not want to be in the position of a staffing deficiency, however we have gambled as long as we can.

74.    On or about May 19, 1999, Claywest administrator B.V. in an e-mail to Kaiser stated:

"I am still having major problems staffing nights . . . when I go to schedule and have only four

and need a minimum of 9 . . ."

75.    On or about May 20, 1999, Claywest administrator B.V. in an e-mail to Kaiser stated:

"Yes, since there are only 3 nurses and about 8 aides to make up the entire schedule for nights at

this time. That means I am "50% down at night." On the same date in an e-mail to Kaiser, B.V.

stated: "Now I simply pray for more nursing staff."

76.    On or about May 24, 1999, Claywest administrator B.V. in an e-mail to Kaiser stated:

"that leaves me with absolutely no night nurses for this holiday weekend and only four nurse

assistants two of which are new and not very reliable."

77.    **Resident E.B.**

a.    Resident E.B. resided at Claywest from about 1997 to on or about May 21,

1999.

21

b.      From about December 1997 to on or about February 5, 1998, Resident E.B. lost approximately 16 pounds. From about August, 1998 to April 1999, E.B. continued to lose weight.

c.      On or about May 10, 1999, a registered dietician reported that Resident E.B. had lost 5.2 pounds in the last month, 5.1 pounds in the last three months and 5.9 pounds in the last six months.

d.      On May 14, 1999, Claywest staff reported that Resident E.B. ate 100% of her dinner when fed by her daughter. On May 16, 1999, Claywest staff reported that Resident E.B. ate 100% of breakfast and lunch.

e.      From on or about May 16, 1999 to May 21, 1999, there were no entries in the nursing notes.

f.      On May 21, 1999, Resident E.B. was transferred from Claywest to the hospital due to breathing difficulties. Upon admission EMS reported to a hospital nurse that Resident E.B. had not eaten or drunk anything in one week.

g.      On May 21, 1999, Resident E.B. died at the hospital.

h.      Claywest submitted a claim for reimbursement for the care purportedly provided to Resident E.B. from May 16, 1999 through May 21, 1999. Medicaid paid Claywest's claim.

78.     About two weeks after Resident E.B.'s death, on or about June 1, 1999, Claywest administrator B.V. in an e-mail to Kaiser stated: "My night staff just keeps dwindling away." On the same date in an e-mail to Kaiser, B.V. stated: "Still resident care suffers because of just barely having the staff to care for 164-168 on average."

22

79. **State Survey**: On or about June 10, 1999, administrator B.V. in an e-mail to Kaiser stated that the State survey team arrived at Claywest at 5:30 a.m. She further reported that there were "8 complaints that deal with all types of care . . . I suggest that you pray, just as [the Director of Nursing] and I have done for the last 75 days."

80. **State Survey - Insufficient Staffing**: On or about June 12, 1999, the State cited Claywest for deficiencies, including insufficient staffing (F tag 353).

81. **Resident C.B.**

    a.    Resident C.B. was an 82-year-old man, who was confused and disoriented and inclined to wander into the rooms of other residents.

    b.    On or about March 22, 1999, Resident C.B.'s diet was changed to a pureed diet because of swallowing difficulties.

    c.    On or about June 17, 1999, the records reflect that Resident C.B. had possibly aspirated between about 12:45 and 1:00 p.m.

    d.    At about 1:00 p.m., on June 17, 1999, Resident C.B.'s doctor ordered an x-ray. The records do not indicate that an x-ray was performed or that any other intervention was done.

    e.    At about 6:00 p.m. on June 17, 1999, Resident C.B. died while his wife was feeding him.

    f.    There was no registered nurse on duty from 12:00 a.m. to 6:00 a.m. and from 5:00 p.m. to 11:00 p.m. on June 17, 1999. Nor was there a plan of care to prevent aspiration, to stop feedings by mouth, or to monitor Resident C.B. after a possible aspiration that same morning.

g.   Claywest submitted a claim for reimbursement for the care purportedly provided to Resident C.B. on June 17, 1999.

82.   On or about January 21, 1999, Claywest administrator B.V. informed Kaiser that the president of the Claywest Family Council asked about the staffing levels required by the consent decree. In a second e-mail on the same date, B.V. informed Kaiser that "many times we meet those levels and some we do not."

83.   **Plan of Correction:**   On July 6, 1999, Claywest submitted a Plan of Correction, wherein Claywest stated that " [t]he facility will employ sufficient nursing staff to provide nursing and related services . . . " and "agency staffing is being utilized to fill vacancies."

84.   In an e-mail dated July 20, 1999, to the facility administrators, Defendant Wachter stated:

> To say that I am upset with payroll and staffing overages would be an understatement. We have tried and tried to assist the facilities in staffing guidelines, payroll and budget controls to no avail. Administrators and DON's are simply not doing their jobs when it comes to budget controls . . . Be prepared to present your plan of correction on what you personally will do to prevent payroll and staffing overages.

85.   About two weeks after stating that agency staff would be used to fill vacancies, on or about July 23, 1999, Kaiser, the President of AHM, told the facility administrators: "REMEMBER THIS IF NOTHING ELSE. It is more likely that you will win the lottery before I let you use an agency." Defendant Wachter was present at this meeting.

86.   **Resident V.B.**

a.   Resident V.B. was a resident at Claywest in July 1999. Her hip had been surgically pinned and was unstable. She was neither terminally ill nor suffering from dementia.

24

b.     On the morning of July 29, 1999, a nurse performed a pulse oximetry reading, that indicated that Resident V.B. required immediate transport to a hospital.

c.     Eventually, Resident V.B. was hospitalized on July 29, 1999, for an acute myocardial infarction and died on August 23, 1999.

d.     Claywest submitted a claim for reimbursement for the care purportedly provided to Resident V.B. from July 25, 1999 through July 28, 1999. Medicaid paid the claim.

87.  **Resident M.R.**

a.     Resident M.R. was a 78-year-old resident male who was confused and essentially immobile. Resident M.R. suffered from a series of health problems and was on a low bed to prevent injuries from falls.

b.     On July 28, 1999, at about 4:00 p.m., Claywest employee A observed another Claywest employee, K.W., make a derogatory statement about Resident M.R., which included a threat of bodily harm to Resident M.R.

c.     On August 2, 1999, between 11:45 p.m.-12:15 a.m., Resident M.R. was found in bed covered in blood. Resident M.R.'s gown was ripped and he had severe bruising and swelling to the face, especially under the eyes and at the bridge of the nose, multiple bruises to the arms and legs, and an open laceration to the lip.

d.     Resident M.R. was transported to the emergency room around 1:00 a.m. on August 3, 1999. Resident M.R. returned to Claywest at about 3:12 a.m. on the same day.

e.     On August 5, 1999, another Claywest employee observed that Resident M.R. was unresponsive and that one of his pupils was dilated and the other pupil was like a pinpoint. This indicated that Resident M.R. had suffered a serious head injury.

25

f. On August 5, 1999, at about 6:45 a.m., Resident M.R. was transported to the emergency room at St. Joseph's Medical Center. On August 7, 1999, Resident M.R. died at the hospital due to a subdural hematoma or closed head trauma.

g. Although required to do so by State law, Kaiser and Defendants Wachter, AHM, and Claywest failed to report the suspected abuse of and injuries to Resident M.R.

h. Claywest submitted a claim for reimbursement for the care purportedly provided to Resident M.R. from July 28, 1999 through August 4, 1999.

88. **State Survey - Insufficient Staffing**: On or about August 6, 1999, the State cited Claywest for deficiencies, including insufficient staffing (F tag 353).

89. On or about August 24, 1999, Kaiser at a meeting of facility administrators reported that B.V., the Claywest administrator, had been terminated because she could not "follow the staff parameters." Concerning agency staffing, Kaiser stated: "The current Administrator in that building where there's agency won't be sitting at this table as the Administrator of that building at the next meeting." Defendant Wachter was present at this meeting.

90. **Plan of Correction**: On or about September 20, 1999, Claywest submitted a Plan of Correction that stated that "[t]he facility will employ sufficient nursing staff to provide nursing and related services . . . "

91. On or about September 8, 1999, the State sought to revoke Claywest's license for a second time.

92. On or about September 28, 1999, the Claywest Director of Nursing in an e-mail to Kaiser discussed the staffing problems at Claywest and further stated: "Can't tell you what the solution is to fix Claywest. Can tell you that I can't work days and nights, nor can Joyce."

93.   **State Survey - Insufficient Staffing**:  On or about November 3, 1999, the State cited Claywest for insufficient staffing.  Specifically, the State found that on October 12, 1999, during the night shift the "Freedom Wing," where Alzheimer's residents were housed, was staffed by one employee.  The State further found "1 nurse aide for 27 residents on A wing; 2 nurse aides for 29 residents on B wing; 1 nurse aide for 15 residents on C wing; 1 nurse aide for 19 residents on D wing; and 1 RN charge nurse."

94.   Claywest submitted claims for reimbursement for the care purportedly provided to these residents on October 12, 1999.  Medicare and Medicaid paid Claywest's claims.

95.   **Plan of Correction:**  On October 14, 1999, Claywest submitted a Plan of Correction that addressed the October 12, 1999 violations of State staffing regulations:

> Facility will employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing and related services which enable each resident to attain or maintain the highest practicable level of physical, mental and psychosocial well-being.  Facility will have a licensed nurse in charge who is responsible for evaluating the needs of the resident on a daily and continuous basis.

96.   **Plan of Correction**:  On or about November 19, 1999, Claywest submitted a Plan of Correction that addressed the October 12, 1999 violations of federal regulations related to inadequate staffing.  Claywest stated that "[t]he facility will employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing related services."

97.   **Plan of Correction**:  On or about December 29, 1999, Claywest represented that the "[f]acility will provide sufficient nursing staff to provide services and meet resident needs."

98.   On or about June 27, 2000, at a meeting of facility administrators, Kaiser reported that he had photographed conditions at AHM facilities and stated:

27

There isn't a single picture here that is acceptable quality to us or the State . . . All of these are deficiencies . . . If Jeff City saw these they would cut funding to Nursing Homes . . . This is all unacceptable and all deficiencies . . . and this isn't even nursing.

Kaiser presented a slide show to Defendant Wachter and the others in attendance. The minutes of the meeting reflect the following statements by Kaiser concerning the conditions he observed at the facilities:

- Shower rooms that look like Dauchau . . .
- Dried blood or feces I couldn't tell . . .
- Another shower room with exposed chemicals and three junctions coming out of the wall . . .
- Toilets and floors in terrible shape . . .
- Bathtubs used as storage . . .
- Food or excrement on the floor in the shower room and it smelled . . .
- Shower room with purse, sodas, soiled diapers, and a towel on the floor . . .
- Therapy room used for storage . . .
- Growth around the bottom of the floor jams . . .
- Rust along the wall and dirt in the shower doors . . .
- Four chairs just shoved in a shower room . . .
- Unlocked room in the [Alzheimer's] unit that is a storage room . . .
- Wall plates missing with just wires sticking through them . . .
- Bad odors and dirty laundry . . .
- Dark brown stuff on the shower floor . . .
- Soiled linen on the shower room floors . . .
- More feces on the toilet seats . . .
- Rusted out bath tub . . .
- Another bathtub used for storage . . .
- Floors not fully cleaned . . .
- 3 new Geri Chairs in one bathroom that shouldn't be there . . .
- Bad air vents in shower rooms . . .

99. At the next meeting of facility administrators on or about July 27, 2000, Kaiser, a licensed attorney at the time, stated that asking the government to pay for substandard care was Medicare fraud. The minutes of the meeting indicate that Kaiser made the following statement:

Beside the fact the Federal Government doesn't like nursing homes right now and the State doesn't like us nor does the life style groups. So, the Federal Government

> comes into your building and says you aren't in compliance now and you have asked
> the government to pay for care that should have been up to standards but wasn't. You
> lied to us because you said it was good care and it wasn't and that is Medicare fraud
> . . . Mr. Wachter and Mr. Kaiser are going to jail.

Defendant Wachter was present at the meeting.

100. Subsequent to the July 27, 2000 meeting, Defendants did not inform the State or the

Medicare Program of the conditions that Kaiser had documented. Moreover, the Defendants

submitted claims for reimbursement for the residents housed in the facilities where these

conditions existed.

101. On or about August 17, 2000, the State again cited Claywest for insufficient staffing

(F tag 353).

102. **Plan of Correction**: On or about September 2, 2000, Claywest submitted a Plan of

Correction, which stated that the: "[f]acility will have sufficient nursing staff to provide nursing

and related services . . . "

### Oak Forest North

103. **Resident D.L.**

    a.    Resident D.L. had lived at Oak Forest North since June 1994. In April 1999,

she was an alert and oriented 88-year-old, with diagnoses of atrial fibrillation, history of a

thrombosis and chronic constipation. Resident D.L. was able to feed herself, transfer and walk

around independently, but used a wheelchair for longer distances.

    b.    Resident D.L. was hospitalized in January and August 1998 for treatment of

worsening constipation. Her physician documented that she required manual impaction removal

and enemas. Resident D.L. was given two choices of treatment, either a colostomy or a routine,

aggressive program of medications, enemas and digital removal. Resident D.L. chose the second option.

  c. On April 4, 1999 at 10:30 a.m., Resident D.L. complained of nausea and pain in her lower abdomen. When nursing staff assessed her, they found her abdomen to be hard, tender, and more distended than usual. Throughout the day, Resident D.L. continued to complain of increasing pain. She also vomited a small amount.

  d. At 7:00 p.m. on April 4, 1999, Resident D.L. was in her room and called the nurse's station and said she needed help because she still had not had a bowel movement. The nurse checked her for impaction and removed a small amount of hard stool from her rectum. The nurse gave her a second Fleet enema. At about 7:15 p.m., a staff member assisted Resident D.L. to the bathroom, but there were no results from the enema. The nurse did not notify Resident D.L.'s physician of her continuing complaints of abdominal pain or that the laxatives and enemas were ineffective in relieving the constipation and impaction.

  e. At about 7:51 p.m. on April 4, 1999, Resident D.L. left the following message on the facility voice mail: "I laid on the bed waiting and waiting. You said you would be right over. That was an hour ago, okay. I'm waiting for an enema, all right? Are you there? No, okay."

  f. By 8:00 p.m. on April 4, 1999, Resident D.L.'s stomach was like a rock. At 8:30 p.m. on April 4, 1999, Resident D.L. was sitting on the side of her bed and was still complaining of abdominal pain.

  g. Around 10:00 p.m., Resident D.L. still had not had a bowel movement and was complaining of severe abdominal cramping. The staff did not notify Resident D.L.'s physician

of her continuing complaints of severe abdominal pain or that the laxatives and enemas were ineffective in relieving the constipation and impaction.

      h.     Resident D.L.'s chart does not indicate that her vital signs were checked from 7:00 a.m. to 10:30 p.m. on April 4, 1999.

      i.     No one entered Resident D.L.'s room during the night shift, from 11:00 p.m. to 7:00 a.m.

      j.     On April 5, 1999, Resident D.L. did not come to the dining room as usual for breakfast. An aide went to her room and found her dead, sitting in her bathroom. She was slumped to her left side with no vital signs and an extremely enlarged abdomen.

      k.     Oak Forest North submitted a claim for reimbursement for the care purportedly provided to Resident D.L. on April 4, 1999.

    104. **State Survey - Insufficient Staffing**: From on or about May 27, 1999 to on or about June 1, 1999, the State conducted a re-visit at Oak Forest North. The State cited Oak Forest North for insufficient staffing, as reflected in the Statement of Deficiencies.

> On or about 5-27-99 from 8:40 p.m. to 11:00 p.m. four nursing staff were on duty. The census was 105. On 5-27-99 from 11:00 p.m. to 5:28 a.m. (5-28-99) five staff were on duty. The census was 105. On 5-28-99 from 7:25 p.m. until 11:00 p.m. five staff were on duty. The census was 105. On 5-30-99 from 8:00 p.m. to 11:00 p.m. four staff were on duty. The census was 106. On 5-30-99 from 4:00 a.m. to 7:00 a.m. four staff were on duty. From 8:00 p.m. to 11:00 p.m. five staff were on duty. The census was 106. On 5-31-99 from 4:00 a.m. to 5:00 a.m. and from 8:45 p.m. until 11:00 p.m. five staff were on duty. From 11:00 p.m. to 7:00 a.m. (6-1-99) four staff were on duty. The census was 106. On the above five days, the state fire safety staffing was not met.

### Lutheran Care

105. **Resident T.L.**

     a.    Resident T.L. was a 47-year-old man with chronic medical conditions, including insulin dependent diabetes. Resident T.L. had eloped from a facility twice before and his mother had told the facility that Resident T.L. would leave the facility if given the opportunity. The physician's orders included elopement precautions and directed that Resident T.L. was to be monitored every one to two hours.

     b.    On or about November 28, 2000, Resident T.L. was seen going up the street to the store and he was escorted back to the building. Resident T.L. said he was able to push the secured door open and leave the unit. On December 1, 2000, staff documented in his medical record that Resident T.L. walked around the hall and had gone to the corner store.

     c.    On or about December 11, 2000, at about 12:30 p.m. a staff member went to get Resident T.L. for lunch, but he was not in the unit.

     d.    On or about December 11, 2000, Resident T.L. walked two blocks to the bus stop, caught the bus and traveled several city blocks to his mother's home. His mother was not home and a neighbor let him in. Resident T.L.'s mother telephoned the facility at 4:45 p.m. to advise that Resident T.L. was at her home.

     e.    When Resident T.L. left the facility, he was wearing tennis shoes and socks, a lined shirt, a t-shirt, and thin pants. The National Weather Service reported that at 1:00 p.m. on December 11, 2000, the temperature was 28 degrees Fahrenheit with freezing rain.

     f.    Lutheran submitted a claim for reimbursement for the care purportedly provided to Resident T.L. on December 11, 2000.

106. **Resident J.A.**

    a.    Resident J.A. was admitted to the Behavioral Unit at Lutheran on January 10, 2001, with a diagnosis of insulin dependent diabetes. Prior to March 31, 2001, Resident J.A. made multiple attempts to leave the unit through the fire exit door and the service elevator.

    b.    On the evening of March 31, 2001, Resident J.A. was sitting in the dining room. At approximately 8:30 p.m., Resident J.A. was missing. An employee searched for Resident J.A. and noted that the fire alarm was not set on the fire door. A housekeeping employee had observed Resident J.A. earlier that evening, opening and closing the fire exit door several times without causing the alarm to sound. Records show that the police, family and physician were notified of the elopement.

    c.    On the early morning of April 1, 2001, Resident J.A. still had not been found. At approximately 10:00 a.m., the elevator repairman went to the elevator machine room, which is located on the facility's roof. There he found Resident J.A. sitting in the unlocked machine room. Resident J.A. was barefoot, covered in oil and blood, and suffering from a variety of scratches, bruises, and abrasions.

    d.    The Statement of Deficiency states that Resident J.A. was at risk of electrocution from the 400 volts of electricity readily accessible in the machine room. There was also the risk that he would fall from the roof or sustain injuries from moving equipment in the room.

    e.    Lutheran submitted a claim for reimbursement for the care purportedly provided to Resident J.A. on March 31, 2001 and April 1, 2001. Medicaid paid Lutheran's claim.

33

## Oak View Skilled Care

107. From on or about April 20, 1999 to on or about July 24, 2000, Oak View Skilled Care was cited three times for insufficient staffing.

108. **Resident A.P.**

a.    Resident A.P. was an 84-year old woman who was alert, mostly oriented, and aware of her surroundings. She was admitted to Oak View in August 2000, with a history of stroke, congestive heart failure, dementia, coronary artery disease, and renal insufficiency.

b.    On or about September 18, 2000, Resident A.P. was hospitalized for dehydration and diarrhea. Both conditions resolved while at the hospital.

c.    On or about September 23, 2000, Resident A.P. returned to Oak View, with no open areas on her skin. She was alert and oriented, but totally dependent on the facility's staff for all of her daily care, including repositioning, prevention of pressure sores, cleansing her skin after episodes of incontinence, and providing adequate nutrition and fluids.

d.    On September 24, 2000, Resident A.P. was alert and talking and able to eat and drink with assistance.

e.    By September 27, 2000, Oak View staff was not consistently assisting Resident A.P. with her meals. Resident A.P. began to lose weight rapidly.

f.    During the last week in September, 2000, Resident A.P. was left in her wheelchair, sitting in feces for extended periods of time.

g.    On September 25, 2000, the physician for Resident A.P. ordered physical and occupational therapy to increase her strength and assistance with activities of daily living.

h.      On September 25, 2000, the physical therapist notified the Oak View nursing staff that Resident A.P.'s skin was breaking down.

i.      On September 28, 2000, Resident A.P.'s physician ordered that the pressure sores on the resident's coccyx be treated. After receiving the results of the blood tests, the physician directed Oak View staff to call the resident's family and to send Resident A.P. to the hospital. Oak View staff made contact with a distant family member, who had no legal authority to decide whether or not to send Resident A.P. to the hospital. Oak View did not send Resident A.P. to the hospital.

j.      On or about October 4, 2000, beginning at about 5:30 a.m., Resident A.P. had severe bloody diarrhea and was moaning and crying in pain. The physician's office directed that the resident be transferred to the hospital by ambulance.

k.      On October 4, 2000, Resident A.P. was seen in the hospital emergency room for dehydration and bloody diarrhea. Resident A.P. was unresponsive, her skin was pale and cool, and her body temperature and blood pressure were below normal.

l.      Upon admission to the emergency room on October 4, 2000, Resident A.P. had multiple pressure sores as described below:

- 10cm stage II pressure sore on her coccyx that was necrotic around the edges with a reddish black center. The sore was about the "size of an average open hand (almost looks like burned skin) with very dark reddish black center." The emergency room record indicated that this pressure sore on her coccyx was not covered with a dressing.
- 4 cm round open draining stage II pressure sore on the inner aspect of her left knee.
- 5 cm round stage II pressure sore on the inner aspect of her right knee.
- 0.25 cm open pressure sore on her left ear lobe.
- Stage I pressure sore on her right ear lobe that was discolored.

35

- Large unopened black colored blisters on both of her heels. The blisters were approximately 2 cm in diameter and the surrounding 3 cm of tissue was mushy.
- Perineum/groin was excoriated, red, serosanguinous.

m.     On October 5, 2000, Resident A.P. died at the hospital.

n.     Oak View submitted a claim for reimbursement for the care purportedly provided to Resident A.P. from September 1, 2000 to September 18, 2000 and from September 23, 2000 to October 4, 2000. Medicare paid the claim.

109. **Resident R.D.**

a.     Resident R.D. had multiple chronic medical problems, was incontinent of both bowel and bladder and was totally dependent on the staff for cleansing and positioning.

b.     On the morning of April 19, 2001, Resident R.D. sat upright in a chair in the hallway outside his room. At 10:00 a.m. Resident R.D. said he was wet, needed to be cleaned, and his bottom was sore. He was not changed or cleaned.

c.     Resident R.D. continued to sit outside his room until 12:35 p.m. when facility staff transported Resident R.D. to the dining room. He still had not been changed or cleaned. After eating lunch, the facility staff wheeled Resident R.D. to the hallway outside Resident R.D.'s room and left.

d.     At 1:20 p.m., the State surveyor asked Oak View staff to provide incontinence care to Resident R.D. When the care was provided, a name tag was found in the adult diaper of Resident R.D. The name tag belonged to the Oak View aide who last provided incontinence care to Resident R.D. at 9:00 a.m.

e.     Oak View submitted a claim for reimbursement for the care purportedly provided to Resident R.D. on April 19, 2001. Medicaid paid Oak View's claim.

110. **Resident L.A.**

    a.    On or about April 16, 2001, Resident L.A. was assessed. He had a stage I pressure sore, was bed or chair bound, was incontinent of bowel and bladder, and had a recent history of dehydration and poor nutrition.

    b.    On the afternoon of April 17, 2001, Resident L.A. laid in bed on a regular mattress and was incontinent of urine. Oak View staff did not provide the resident a pressure-relieving mattress nor prompt cleansing after incontinence to prevent pressure sores.

    c.    In the early evening of April 17, 2001, at 6:00 p.m., Resident L.A. again laid in bed awake and soaked with urine. The bed pad beneath the resident was wet and wrinkled and the gown was wet with urine.

    d.    The wound care order dated April 17, 2001, indicated that the physician directed staff to apply Lanaseptic ointment on the resident's heels and wrap both feet with cling gauze once every shift (3 times a day).

    e.    On April 18, 2001, Resident L.A.'s skin was assessed. The assessment showed the resident had multiple pressure sores, including many at the stage II level.

    f.    While removing the old wound dressings on the resident's feet, a staff member noted that Resident L.A. had the same dressings that were applied during the day shift on April 17, 2001.

    g.    According to the treatment administration records, facility staff failed to provide treatment for the pressure sores at least 19 times between April 7, 2001 through April 18, 2001.

## Westview

111. **Resident C.T.**

a.    Resident C.T. was admitted to Westview on April 9, 1999, with a diagnosis of dementia with delusions. Because of his history of wandering and eloping from two other facilities, he required a secure environment with close monitoring. He was admitted to the Alzheimer's unit where the doors had a 15 to 30 second delay before the doors opened.

b.    On April 11, 1999, the unit where Resident C.T. lived had a census of 31 residents who required staff supervision and intervention for their care and safety.

c.    On April 11, 1999, Resident C.T. was found approximately ½ mile from the facility. A community resident saw him fall and called 911 at 6:23 p.m. Resident C.T. suffered an abrasion on the bridge of his nose and his left knee.

d.    Westview submitted a claim for reimbursement for the care purportedly provided to Resident C.T. on April 11, 1999. Medicaid paid Westview's claim.

## Florissant

112. **State Survey - Insufficient Staffing**: On or about April 26, 2001, the State cited Florissant for insufficient staffing. On this date, the facility had a census of 76 residents. A record review of the conditions of the 76 residents revealed that: 73 residents needed help with bathing; 69 residents needed help with dressing; 55 residents needed help with transferring; and 61 residents needed help with toileting. Ten residents received tube feedings, seven residents had pressure sores, 24 were occasionally or frequently incontinent of bladder. 32 residents had

diagnoses that included dementia, and 18 residents had behavioral symptoms. A nurse,

identified in the Statement of Deficiency as Nurse I, stated:

> . . . there are two CNA's and one licensed nurse for each shift on the west hall, and
> that is not enough to care for all of the residents that require extensive assistance from
> staff . . .. Nurse I said that he/she performed a breakdown of the time for care with
> the staffing provided. Each resident receives about seven minutes of care each shift.
> He/she said there is not enough time to follow through and give the residents the care
> needed, do all the paper work, chart, notify physician's, transcribe orders and all the
> other phone calls that need to be done.

## DEFENDANTS' KNOWLEDGE OF THE
## LACK OF CARE AT THE NURSING FACILITIES

113. Defendants had actual knowledge that nursing facilities operated and managed by

AHM were providing inadequate care and that claims for reimbursement were being submitted

for services that were so inadequate or deficient as to constitute worthless services.

### Survey Statements of Deficiencies/License Revocations

114. Beginning in 1997, the State repeatedly conducted surveys of facilities managed by

AHM and cited the facilities for serious deficiencies. The survey reports described systemic

deficiencies, including but not limited to:

    a.    failure to employ nursing personnel in sufficient numbers and with sufficient

qualifications to provide nursing and related services which enable each resident to attain or

maintain the highest practicable level of well-being;

    b.    failure to follow basic dietary requirements;

    c.    failure to provide a therapeutic diet when there was a nutritional problem;

    d.    failure to administer medication;

    e.    failure to prevent and treat pressure sores;

f.     failure to provide necessary services to maintain good nutrition, grooming and personal and oral hygiene for residents who were unable to carry out activities of daily living;

g.     failure to timely conduct criminal background check on employees;

h.     failure to notify the resident's physician when there was an accident involving the resident which had the potential for physician intervention, a significant change in the resident's physical, mental, or psychosocial status or a need to alter treatment;

i.     failure to ensure that each resident receives adequate supervision and assistance devices to prevent accidents;

j.     failure to adequately assess, inform the physician, follow physician orders, and reassess to prevent avoidable declines and maintain or improve the resident's status;

k.     failure of the facility to ensure that it is free of medication error rates of five percent or greater; and

l.     failure to maintain a clean and homelike environment resulting in extensive accumulation of dust, food and other debris, broken furniture, strong urine odors and sticky floors.

115. Defendants responded to the statements of deficiencies and falsely and fraudulently represented in the plans of corrections that the deficiencies had been corrected.

116. Because of repeated deficiencies and violations cited by the State, several of the facilities managed by AHM were in danger of losing their licenses and Medicaid and Medicare certification.

40

a.    In June 1998 and again in September 1999, the State attempted to revoke Claywest's license. Claywest continued to operate based on promises it would comply with certain conditions set by the State.

b.    On June 30, 1999, the State attempted to revoke Oak Forest North's license. Oak Forest North was permitted to continue to operate based on promises that it would comply with certain conditions set by the state.

c.    The State attempted to revoke Scenic View's license on June 17, 1998. Scenic View was permitted to continue to operate based on promises that it would comply with certain conditions set by the State.

d.    On or about June 1, 1999, the State entered into a consent agreement with AHM Skilled and Assisted Living Center, which permitted it to continue to operate based on promises that it would comply with certain conditions set by the State.

**Federal Civil Monetary Penalties**

117. Because of deficiencies at the nursing facilities, CMS imposed civil monetary penalties on several of the nursing facilities managed by AHM including but not limited to:

a.    Claywest on or about April 6, 1998

b.    Oak Forest North on or about April 4, 1999

c.    Oak View on or about October 5, 2000, and

d.    Lutheran on or about April 1, 2001.

CMS is authorized by federal law to impose civil money penalties when a facility is not in substantial compliance with the requirements for participation in the Medicare and Medicaid

41

Programs and the conditions in the facility constitute immediate jeopardy to the health and safety of residents.

## Complaints of Facility Administrators

118. During all times relevant to this indictment, Defendant Wachter and AHM President Kaiser participated in numerous meetings with facility administrators, who discussed the lack of staffing and the resulting negative effect on the care provided to residents. In numerous e-mails to AHM President Kaiser and Defendant Wachter, the administrators informed them of the insufficient staffing at the facilities

## Private Civil Settlements

119. During times relevant to this indictment, Defendant AHM and the nursing facilities managed by AHM entered into a number of settlements of civil lawsuits brought by relatives of residents of AHM-managed facilities. The civil lawsuits alleged that residents had died or suffered serious injury as the result of the inadequate care provided by the facilities.

## TAKING OF PROFITS

## Distributions from AHM and Nursing Facilities

120. Defendant Wachter and co-owner Breece personally profited at the same time that the quality of the care given to the residents at the facilities deteriorated and while the facility administrators were being told to abide by the "magic formula" to keep payroll expenses down.

121. As set forth in the cost reports submitted to Medicare and Medicaid and tax returns, the following distributions were made:

42

| Date of Distribution | From | To | Amount |
|---|---|---|---|
| 1997 | Claywest | Robert D. Wachter Living Trust and R. William Breece, Jr. | $245,000 |
| 1998 through 1999 | Claywest | Robert D. Wachter Living Trust and R. William Breece, Jr. | $1.2 million |
| 1998 through 2001 | Lutheran Care | Robert D. Wachter Living Trust and R. William Breece, Jr. | $1.16 million |
| 1998 through 2001 | Westview | Robert D. Wachter Living Trust, R. William Breece, Jr and General Partners. | $1.97 million |
| 1997 through 1998 | Oak Forest N. | Robert D. Wachter Living Trust and R. William Breece, Jr. - 84% owners | $572,000 |

122. As set forth in the cost reports submitted to Medicare and Medicaid from January 1999 to June 30, 2001, AHM generated profits from the management fees it charged the nursing facilities. AHM began with owners equity on January 1, 1999, of approximately $548,000 and ended with owners equity of over $1.9 million on June 30, 2001, with no additional paid-in capital transactions occurring.

123. In 2003, AHM made a distribution of $736,114.35 from owners equity to its members, Defendant Wachter and co-owner Breece.

## Salaries

124. In addition to the profits from the facilities, as the CEO of AHM, Defendant Wachter, received an annual salary as follows:

| | |
|---|---|
| 1998: | $892,820.84 |
| 1999: | $865,608.18 |
| 2000: | $426,188.18 |
| First quarter of 2001: | $243,176.06 |

125. In addition to the profits from the facilities, as a vice-president of AHM, co-owner Breece received an annual salary as follows:

| | |
|---|---|
| 1998: | $444,436.02 |
| 1999: | $443,395.66 |
| 2000: | $339,356.92 |
| First quarter of 2001: | $204,893.74 |

126. According to the cost reports submitted to Medicare and Medicaid, Claywest paid $1,469,607 wages for the entire nursing staff on all shifts at Claywest during 1998. Also in 1998, Defendant Wachter received an annual salary of $892,820.84 and hundreds of thousands of dollars in profit distributions from the AHM facilities. In the same year - 1998, Claywest was cited numerous times for insufficient staff to provide adequate care to residents.

127. According to the cost reports submitted to Medicare and Medicaid, in 1999 Claywest paid $1,518,367 in wages for the entire nursing staff for all shifts at Claywest. Also in 1999, Defendant Wachter received an annual salary of $865,608.18 and hundreds of thousands of dollars in profit distributions from the AHM facilities. In the same year - 1999, Claywest was cited numerous times for insufficient staff to provide adequate care to residents.

44

## COUNT I

### Conspiracy

128. The Grand Jury realleges, and incorporates by reference, the allegations in paragraphs

1 to 127 of this indictment and further alleges:

129. From in or about January 1997 and continuing until at least 2003, the exact dates

being unknown to the Grand Jury, in the Eastern District of Missouri, the Defendants,

**ROBERT D. WACHTER**
**AMERICAN HEALTHCARE MANAGEMENT, INC.,**
**CLAYWEST HOUSE HEALTHCARE, LLC,**
**OAK FOREST NORTH, LLC,**
**and**
**LUTHERAN HEALTHCARE, LLC,**

did knowingly and willfully combine, conspire and confederate, and agree with other persons,

known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.    to make materially false, fictitious or fraudulent statements and representations,

and to use a materially false writing or document knowing the same to contain a false, fictitious,

or fraudulent statement or entry, in connection with the delivery of or payment for health care

benefits, items, or services, in violation of Title 18, United States Code, Section 1035;

b.    to defraud a health care benefit program and to obtain, by means of false or

fraudulent pretenses, representations, or promises, any of the money or property owned by or

under the custody or control of any health care benefit program in connection with the delivery

of or payment for health care benefits, items, or services,  in violation of Title 18, United States

Code, Section 1347;

45

c.    to knowingly and willfully make and cause to be made false statements and representations of a material fact for use in determining rights to such benefits and payments, in violation of Title 42, United States Code, Section 1320a-7b(a)(2); and

d.    having knowledge of the occurrence of an event affecting the initial or continued right to any benefit or payment or the initial or continued right to any such benefit or payment of any individual in whose behalf he has applied for or is receiving such benefit or payment conceals or fails to disclose such event, in violation of Title 42, United States Code, Section 1320a-7b(a)(3).

## PURPOSE OF THE CONSPIRACY

130.  The purpose of the conspiracy was (1) for the Defendants to enrich themselves by fraudulently obtaining funds from the Federal and State governments, (2) to obtain and retain reimbursement for services to residents of nursing homes, which services were either not rendered or were so inadequate as to constitute a worthless service, and (3) to conceal the actual conditions and to conceal from the Federal and State governments the true nature of the care provided to the residents in the nursing homes operated and managed by AHM.

## MANNER AND MEANS

131.  The Defendants and others used the following manner and means in furtherance of the conspiracy. In so doing, the Defendants, at times, used and perverted otherwise lawful conduct in order to further the conspiracy in violation of Title 18, United States Code, Sections 371 and 2.

**Defendants' Control of the Budget**

132. It was part of the conspiracy that Defendant Wachter determined the budget for each nursing facility, without considering the acuity or the care needs of the residents in the facilities.

**Defendants' Control of Staffing - The Magic Staffing Formula**

133. It was part of the conspiracy that Defendants Wachter and AHM determined the level of staffing for each facility on the basis of financial considerations, without regard for the residents' actual needs for services. The Defendants developed and implemented a policy that required that payroll at each nursing facility not exceed 40% of the Medicaid per diem payment.

134. It was part of the conspiracy that the Defendants put direct and repeated pressure on the staff of the nursing facilities to comply with the "magic formula." These directives were given in e-mails, at the monthly meetings of the facility administrators, and at other times.

135. It was part of the conspiracy that the Defendants treated employees adversely if the facilities exceeded the "magic formula."

136. The "magic formula" limiting the amount of money spent on staffing at the facilities directly caused and contributed to insufficient staffing and a lack of care for the residents in the facilities managed and operated by AHM.

**Defendants' "No Agency" Rule**

137. It was part of the conspiracy that the Defendants implemented a policy that prohibited or severely restricted the use of agency staffing at the nursing facilities. Agency staff are generally employees of temporary employment services, and not employees of the facility where they are assigned. A facility incurs more cost for agency staff, than for similar employees of the facility.

47

138. The "no agency" policy contributed to insufficient staffing and a lack of care for the residents in the facilities managed by AHM.

**Defendants' Control Of Overtime**

139. It was part of the conspiracy that the Defendants strictly controlled the use of overtime at the nursing facilities. Defendant Wachter in an e-mail dated August 24, 1998 stated in capital letters: "OVERTIME WILL NOT BE TOLERATED EXCEPT IN EXTREME CASES."

140. This directive regarding the use of overtime directly caused and contributed to insufficient staffing and the lack of care for the residents at the nursing facilities managed and operated by AHM.

**Defendants' Control Of Salary Levels**

141. It was part of the conspiracy that the Defendants controlled the salaries paid to the nursing staff at the facilities. The Defendants frequently refused to increase salaries although administrators in the nursing facilities repeatedly voiced concerns over the shortages of staff. Because salaries in many cases were not competitive, adequately trained staff was difficult to hire and difficult to retain.

142. It was part of the conspiracy that in an e-mail dated August 12, 1998, Defendant Wachter stated that "all raises are subject to my written (e-mail) approval and will not be instituted by anyone until they receive such written approval." This e-mail was in response to an attempt by an administrator to raise salaries so as to be more competitive in recruiting and retaining staff.

143. The cap on nursing salaries directly caused and contributed to the insufficient staffing and the lack of care for the residents at the nursing facilities managed and operated by AHM.

## Defendants' Control Of Expenditures

144. It was part of the conspiracy that the Defendants also controlled non-personnel spending. As set forth in the July 23, 1999 minutes of a meeting of the facility administrators, Defendant Wachter and Kaiser stated that every expenditure over $250 had to be approved by the home office.

145. Defendants' control over expenditures directly caused and contributed to the lack of care provided to the residents at the nursing facilities managed and operated by AHM.

## Defendants' Focus On Profits Over Residents

146. It was part of the conspiracy that the Defendants primarily focused on profits, as resident care suffered.

147. It was part of the conspiracy that the Defendants pressured facility administrators to increase the census (the number of residents), although they knew there was insufficient staff to care for the residents who were already in the facilities. The following are examples of this pressure.

a.      It was a part of the conspiracy that on or about March 29, 1999, at a meeting of the facility administrators, Defendant Wachter stated: "if you've got an upward trend on your revenue or your census and a downward trend on your payroll then you're going to be fine. But if we see trend problems, you're going to be in my office." Defendant Wachter stated at the same meeting: "Bill [Breece] and I want to make money" and "some type of probation" would be imposed if that did not happen.

49

b.    On or about November 30, 1999, Defendant Wachter told the facility

administrators: "We are in the business of taking care of people nobody else is going to take care

of. Get this through your admissions people and your DON and your census will go up." Kaiser

further stated "any rejection of an admission has to be approved by the Home Office."

c.    On or about January 19, 2000, Defendant Wachter told the facility

administrators: "If your DON [Director of Nursing] says that we need more staff, and the census

is down that isn't going to work. They need to understand if census is up then the money is there

to hire more people. This will also help the morale if the staff understands that census will solve

their problems."

148. It was also part of the conspiracy that Defendants discouraged administrators and

directors of nursing from transferring residents to hospitals. The following are examples of this

pressure.

a.    On or about January 19, 2000, Defendant Wachter told the facility

administrators: "You also have to close the back door. Get your DON on board and make sure

your DON isn't sitting around. You're letting your DON send people to the hospital, because

it's too difficult to care for them because staffing. You are letting money go out the back door."

b.    On or about June 27, 2000, Kaiser stated that nursing staff should be "held

accountable for sending someone out to the hospital" and should be written up if they are sending

residents to the hospital for "dehydration and fecal impaction."

## Defendants' Control of Hot Line and Disclosure to Federal and State Agencies

149. It was part of the conspiracy that Defendants discouraged their employees from

reporting instances of suspected abuse and neglect of residents. As an example, on or about July

50

23, 1999, at a meeting of facility administrators, AHM President Kaiser stated "Don't let your

nurses hot line" incidents that they may suspect the State should be called until they had

contacted him or others at the home office. Defendant Wachter was present at this meeting.

150. It was part of the conspiracy that on or about December 1, 2000, at a meeting of the

facility administrators, Kaiser stated that "Never take pictures unless you are healing [pressure

sores]. Pictures should be in your QA Notes." Defendant Wachter concurred and stated: "Don't

put pictures in the chart. Put them in your QA [Quality Assurance]."

151. It was part of the conspiracy that at the same meeting on or about December 1, 2000,

Defendant Wachter told the facility administrators that they must educate their staff on what to

say or not say to State surveyors:

> The deficiency that is seen lately on staffing problems comes from employee's. They
> didn't look at payroll or the schedule it is just what the employee's said to them. If
> they are asked why they didn't look at a residents they say it because there weren't
> enough staff members so they couldn't do their job. You must educate the staff on
> what to say and what not to say. It's not that they are understaffed it's that they aren't
> working hard enough.

152. It was part of the conspiracy that the Defendants attempted to conceal from the State

that they were submitting and causing to be submitted false or fraudulent claims for services that

were not rendered or were so deficient, inadequate, sub-standard as to constitute worthless

services.

## OVERT ACTS

153. In order to effect the objects of the conspiracy and in furtherance of the conspiracy,

the Defendants committed and caused to be committed the following overt acts in the Eastern

District of Missouri and elsewhere. In so doing, the Defendants, at times, used and perverted

otherwise lawful conduct in order to further the conspiracy.

      a.    On or about October 29, 1998, at a meeting of the facility administrators,

Defendant Wachter stated:

> I want all of you to also work on having Town Hall Meetings at your facilities. After
> elections, whoever wins, let them know that you have a conference room for meetings
> and once there . . . hand them a donation for their campaign. This may become very
> useful if you ever get in trouble with the Inspectors; he can go right over to that
> person and say "back off, I've been there, it's a good facility."

      b.    On or about June 8, 2000, Defendant Wachter falsely denied that there was a

policy that payroll costs were not to exceed 40% of revenue. Defendant made this statement

under oath during a deposition in the case of Marsha Coy, et al. v. Claywest House Healthcare,

LLC, Case No. L1022.

      c.    On or about January 23, 2001, at a meeting of the administrators of the

facilities, AHM President Kaiser directed that "[a]gency shouldn't be used at all." Defendant

Wachter was present at this meeting.

      d.    On or about the dates indicated below, the Defendants committed overt acts in

furtherance of the conspiracy, that is, the Defendants submitted or caused to be submitted claims

for reimbursement for services purportedly provided to the residents listed below:

| **Date of Submission** | **Resident** | **Dates of Service** |
|---|---|---|
| June 12, 1998 | R.C. | May 1-15, 1998 |
| May 7, 1999 | M.W. | April 5, 1999 |
| May 7, 1999 | D.L. | April 5, 1999 |
| June 5, 1999 | C.T. | April 26, 1999 |

and entries in connection with the delivery of or payment for health care benefits, items, and services, in that the Defendants stated and represented that the facilities had provided services to the residents named below when the Defendants knew, at the time the claim was submitted, that the services were so inadequate, deficient, and substandard as to constitute worthless services.

| Count | Date of Submission | Resident | Dates of Service |
|-------|--------------------|----------|--------------------|
| II    | December 5, 2000   | J.M.     | November 2-13, 2000 |
| III   | December 7, 2000   | M.F.     | November 1-30, 2000 |
| IV    | April 26, 2001     | R.D.     | April 26, 2001      |
| V     | July 27, 2001      | J.A.     | March 31, 2001      |
| VI    | March 8, 2002      | T.L.     | December 29, 2000   |

All in violation of Title 18, United States Code, Sections 1035 and 2.

A TRUE BILL.

_____

FOREPERSON

CATHERINE L. HANAWAY
United States Attorney

_____

DOROTHY L. McMURTRY, #6703
Assistant United States Attorney

54